**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DONALD E. BEAVERS, | ) | CASE NO. 1:19 CV 00140 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Donald Beavers, ("Plaintiff" or "Beavers"), challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

In July 2015, Beavers filed an application for POD and DIB, alleging a disability onset date

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

of February 1, 2012 and claiming he was disabled due to stroke, memory loss, TIAs,[2] back surgery, bilateral arm surgeries, left wrist fusion, left hip arthritis, lumbar degenerative disc disease, arthritis in both knees, and depression. (Transcript ("Tr.") 193-94, 234.) The application was denied initially and upon reconsideration, and Beavers requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 139-40.) In April 2016, Beavers applied for SSI.[3] (Doc. No. 11 at 2.) According to Beavers, this application "was then escalated to the hearing level but apparently not made part of the record." (*Id.*)

On May 2, 2017, an ALJ held a hearing, during which Beavers, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 53.) On August 24, 2017, the ALJ issued a written decision finding Beavers was not disabled. (*Id.* at 72.) The ALJ's decision regarding Beavers's POD and DIB claim became final on November 26, 2018, when the Appeals Council declined further review. (*Id.* at 13-17.) On November 26, 2018, the Appeals Council issued a partially favorable decision on Beavers's SSI claim, finding Beavers disabled and entitled to benefits as of his 55th birthday but not before, given his residual functional capacity for light work and the ALJ's omission of Beavers's age category change. (*Id.* at 1-10.)

On January 18, 2019, Beavers filed his Complaint to challenge the Commissioner's final

---

[2] Transient ischemic attack, or "TIA," refers to "a brief episode of cerebral ischemia that is usually characterized by temporary blurring of vision, slurring of speech, numbness, paralysis, or syncope and that is often predictive of more serious cerebral accidents." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, http://unabridged.merriam-webster.com (last visited September 25, 2019).

[3] As Beavers notes, the ALJ used Beavers's POD and DIB application date of July 29, 2015 as his SSI application date. (Tr. 53.) However, Beavers represents that the SSI claim "was never adjudicated until the ALJ decision, nor does any record of it appear" in the Transcript filed with the Court. (Doc. No. 11 at 2 n.2.)

2

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 14.)

Beavers asserts the following assignment of error:

> (1)     The [ALJ's] finding that Plaintiff is capable of a range of light work is not
>          supported by substantial evidence.

(Doc. No. 11 at 10.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Beavers was born in May 1962 and was 54 years-old at the time of his administrative hearing

(Tr. 53, 70),[4] making him a "person closely approaching advanced age" under social security

regulations.  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has an 11th grade education and is able

to communicate in English.  (Tr. 71, 94.)  He has past relevant work as a carpenter and auto

mechanic (*Id.* at 70.)

### B.     Relevant Medical Evidence[5]

On June 2, 2015, Beavers went to the Fairview Hospital emergency department after falling

three days earlier, complaining of injuries to his left hip and knee.  (Tr. 343.)  A physical

examination revealed tenderness to the left back, left hip, and left knee, with slight bruising of the

knee and mild laxity of the joint.  (*Id.* at 344.) A lumbar x-ray showed advanced degenerative

changes with severely narrowed disc space with endplate sclerosis and prominent marginal spurs at

L4-5; moderate narrowing and marginal spurs at L1-4 and L5-S1; and hypertrophic degenerative

---

[4] Beavers turned 55 shortly after the hearing and well before the ALJ issued her decision.
(Tr. 53, 70, 72.)  This made Beavers a "person of advanced age" under social security
regulations.  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e)

[5]  The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' Briefs.

changes of the facet joints most prominent at L4-5 and L5-S1. (*Id.* at 350.)  A left hip x-ray showed severe joint space narrowing with subchondral cyst on both sides of the joint and increased sclerosis. (*Id.* at 352.)  These findings were related to "osteoarthritis with bone-on-bone appearance."  (*Id.*) A left knee x-ray showed calcification suggesting chronic bursitis and chondrocalcinosis in the medial and lateral joint compartments related to calcium pyrophosphate deposition disease ("CPDD").[6]  (*Id.* at 354.)

The next day, Beavers followed up with Jesse Templeton, M.D., at Orthopaedic Associates, Inc.  (*Id.* at 372-75.)  Beavers described longstanding left-hip pain, aggravated six months before in a fall in his driveway, which had escalated five days before his visit during another fall.  (*Id.* at 372.) A physical examination showed Beavers to be in moderate distress, with an antalgic gait and limited range of motion of the left hip.  (*Id.* at 373-74.)  Dr. Templeton reviewed the June 2, 2015 imaging and diagnosed symptomatic degenerative joint disease of the left hip, lumbar spondylosis, and chondrocalcinosis[7] of the left knee.  (*Id.* at 374.)  He recommended low-impact activities and suggested Beavers consider using a cane.  (*Id.*)  Dr. Templeton also discussed with Beavers  the possibility of a total hip replacement.  (*Id.*)

On June 25, 2015, Beavers followed up with Dr. Templeton and received a corticosteroid injection in his left hip.  (*Id.* at 376.)  Beavers showed some improvement immediately after the injection.  (*Id.*)

---

[6] Calcium pyrophosphate is "the pyrophosphate salt of calcium . . . Crystals of the dihydrate form occur in the joints in calcium pyrophosphate deposition disease." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 272 (30th Ed. 2003).

[7] "[T]he abnormal deposition of calcium salts in cartilage (as of joints)."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, http://unabridged.merriam-webster.com (last visited September 25, 2019).

4

On September 22, 2015, Beavers underwent a rheumatology evaluation with Bassam Alhaddad, M.D., for gradually progressive overall body pain and fatigue, much worse in the last ten to twelve months, with pain in the neck, shoulders, arms, hands, hips, and knees, as well as morning stiffness, severe fatigue and tiredness, and irritability.  (Tr. 384.)  Upon examination, Dr. Alhaddad noted Beavers presented with a flat affect and was ill-looking.  (*Id.*)  Dr. Alhaddad found tenderness in all joints.  (*Id.*)  Other positive exam findings included: (1) tender cervical range of motion; (2) bilateral tenderness in the shoulder range of motion; (3) the ability to perform a reduction up to 170 degrees with significant discomfort at the end of the range of motion; (4) bilateral MCP and PIP tenderness; (5) seizure restricted left hip range of motion; and (6) bilateral knee creptius with no swelling. (*Id.*)  Dr. Alhaddad noted Beavers's range of motion of his right hip was "okay," he had no trochanteric bursa tenderness, and he had normal forward flexion.  (*Id.*)  Dr. Alhaddad opined that Beavers's pain may be multifactorial, including severe left hip osteoarthritis and chondrocalcinosis in the left knee, which suggested possible CPPD-like disease with accelerated osteoarthritis, and seemed to have severe fibromyalgia superimposed on underlying inflammatory or degenerative arthritis.  (*Id.*)   He gave Beavers a steroid injection, presecribed Prednisone and an exercise program, and ordered labs.  (*Id.* at 385.)

A September 22, 2015 cervical x-ray showed moderate disc space narrowing with spurs most prominent at C6-7, and degenerative changes of uncovertebral joints most prominent at C5-7. (*Id.* at 403.)  This imaging also noted "good cervical mobility without evidence of instability."  (*Id.*)  Hand and wrist x-rays taken the same day showed mild degenerative arthritis of both hands.  (*Id.* at 405-06.)

On October 6, 2015, Beavers followed up with Dr. Alhaddad, who noted the injection and

5

Prednisone had produced no change or improvement.  (*Id.* at 383.)  A physical examination revealed no change in multiple tender points, tender range of motion of the shoulder and cervical spine, bilateral MCP and PIP tenderness, and bilateral knee crepitus with no swelling.  (*Id.*)  Dr. Alhaddad diagnosed Beavers with generalized osteoarthritis, more prominent in the left hip, that could be triggered by CPPD disease, with "CV fibromyalgia" secondary to these conditions.  (*Id.*)  His suspicion of inflammatory arthritis was less given Beavers's lack of response to the steroids.  (*Id.*)  Dr. Alhaddad explained the importance of physical therapy, although he noted Beavers was unmotivated to pursue it given his amount of pain.  (*Id.*)  Dr. Alhaddad referred Beavers to a pain management clinic.  (*Id.*)

On October 28, 2015, Beavers fell backwards down fifteen steps and was admitted to Fairview Hospital, where he remained until October 31, 2015.  (*Id.* at 416-64.)  Beavers complained of numbness in his legs and pain in his neck and back.  (*Id.* at 440.)  A pelvic x-ray showed advanced joint space narrowing with subcondral sclerosis and cystic changes of the left hip, and moderate degenerative changes and joint space narrowing of the right hip.  (*Id.* at  416.)  Spinal MRIs conducted on October 29, 2015 showed cervical spondylosis, thoracic spondylosis, and lumbar spondylosis most pronounced at L5-S1 with impingement on the exiting right L5 nerve root related to facet hypertrophy and diffuse disc bulging.  (*Id.* at 449-50.)  Beavers was admitted to the ICU and consulted with neurology and physical therapy.  (*Id.* at 458.)  Beavers was discharged with trauma diagnoses of neck and back pain post-fall, and secondary diagnoses of alcohol intoxication, fibromyalgia, and chronic mastoiditis.  (*Id.*)  The discharge instructions included recommendations to continue physical therapy at home.  (*Id.*)

On November 5, 2015, Beavers underwent a pain management consultation with Girgis E.

6

Girgis, M.D., at Fairview Hospital.  (*Id.* at 511.)  Beavers complained of all over body and joint pain that started eight months ago and had been getting worse.  (*Id.*)  The pain was aggravated by sitting, standing, forward flexion, lifting, standing up from sitting, lying down, and walking, and relieved by lying down and medication.  (*Id.*)  A physical examination revealed diffuse lumbar tenderness, antalgic gait, lumbar surgical scar, and diminished light-touch sensation in the left L4 and L5 dermatomal distributions.  (*Id.* at 514.)  Motor strength was 5/5 throughout and all extremity joints were normal.  (*Id.*)  Dr. Girgis noted a 2012 hospital reference to cocaine use and declined opioid management, instead recommending physical therapy, TENS unit, Zanaflex, and Naproxen for diagnoses that included chronic pain syndrome and lumbar degenerative disc disease.  (*Id.* at 515-16.)

On February 10, 2016, Beavers returned to Dr. Templeton for severe left hip and low back pain.  (*Id.* at 531.)  Dr. Templeton noted Beavers had not been utilizing assistive aids.  (*Id.*)  Beavers explained that his father had passed away, and he had been unable to proceed with a left hip replacement before now.  (*Id.*)  A physical examination revealed tenderness over the posterior aspect of the buttock and the left paravertebral region along the lumbar spine, as well as limited range of motion of the left hip.  (*Id.* at 532.)  Updated imaging again showed end-stage osteoarthritis of the left hip with effusion and cyst, and multilevel lumbar spondylosis with prior fusion at L4-5 and posterior osteophyte formation at L2-3 and L3-4.  (*Id.* at 533.)  Dr. Templeton diagnosed symptomatic rheumatoid arthritis of the left hip and lumbar spondylosis.  (*Id.*)  Beavers agreed to proceed with a left hip replacement and address his back after that.  (*Id.*)

On March 16, 2016, Beavers went to the Cleveland Clinic emergency room complaining of left hip pain and reporting he had been unable to walk for two days.  (*Id.* at 540.)  A physical

7

examination revealed a normal range of motion and no edema, but did find tenderness of the back, left hip, and right knee.  (*Id.* at 542.)   The treatment notes reflect Beavers was walking in the emergency department.  (*Id.* at 543.)  A left hip x-ray taken that day again showed advanced narrowing and degenerative changes of the joint, with interval progression of the erosive and sclerotic changes since October 20, 2015.  (*Id.* at 535.)

On April 11, 2016, Dr. Templeton performed a total left hip replacement. (*Id.* at 527-30, 538-40, 544-69.)

On April 22, 2016, Beavers returned to Dr. Templeton and reported he was "doing very well overall."  (*Id.* at 524.)  A physical examination revealed 4+/5 hip flexor and hip abductor strength, no pain with left knee range of motion, and intact sensation to light touch in all dermatomes.  (*Id.* at 525.)  Dr. Templeton told Beavers to continue with weight-bearing as tolerated and transition to a cane for ambulation.  (*Id.*)

On May 2, 2016, Beavers returned to Dr. Templeton and reported significant pain, with associated burning and numbness of the right lower extremity but no weakness.  (*Id.* at 521.)  Dr. Templeton found these symptoms suggestive of an L5 distribution.  (*Id.*)  On examination, Dr. Templeton found painless internal and external rotation of the right hip, right hip flexion and abduction were 4+/5, mildly diminished EHL strength to 4/5, and moderate discomfort with straight-leg-raise testing.  (*Id.* at 522.)  Dr. Templeton diagnosed subacute right L5 radiculopathy in the setting of prior lumbar fusion and adjacent segment degeneration. (*Id.* at 523.) Dr. Templeton recommended Beavers continue with Percocet and referred him to Dr. Samir Shaia to see if Beavers qualified for epidural steroid injections or other conservative treatment.  (*Id.*)

On May 12, 2016, Beavers saw Samir J. Shaia, D.O.,  for right leg pain and associated

8

burning and numbness.  (*Id.* at 585.)  Beavers explained the pain started a month ago after his left-hip replacement, was aggravated by touching the area, and was alleviated by heat and Percocet.  (*Id.*)  Dr. Shaia noted Beavers was very uncomfortable and was unable to find a comfortable position during the visit.  (*Id.* at 586.)  Dr. Shaia's physical examination revealed a severely antalgic gait, positive straight-leg-raise test on the right, significantly decreased lumbar range of motion, deep palpation tenderness in the lower lumbar, and painful arc of motion to the back.  (*Id.* at 586-87.)  Tandem gait was performed with assistance.  (*Id.* at 587.)  Dr. Shaia opined Beavers would be unable to tolerate physical therapy at this time, and he ordered an MRI.  (*Id.*)

A May 19, 2016 lumbar MRI showed severe foraminal stenosis at the right L5 nerve root, foraminal stenosis at the right L5-S1, markedly narrowed discs from L1-5, and longstanding degenerative disc disease at L4-5.  (*Id.* at 584.)

On May 27, 2016, Beavers saw Dr. Shaia and reported worsening pain. (*Id.* at 627.)  Dr. Shaia noted the MRI had shown significant foraminal stenosis on the right L5 nerve root, which correlated with his symptoms.  (*Id.*)  On exam, Dr. Shaia found Beavers to be in moderate to severe discomfort with a severely antalgic gait, but he was otherwise normal.  (*Id.* at  628.)  Although Dr. Shaia offered epidural injections, Beaver stated he wanted a "permanent fix" for his pain.  (*Id.*)  Dr. Shaia  referred him to a surgeon for a consultation as a result.  (*Id.*)

On June 22, 2016, surgeon Jeffery J. Roberts, M.D., saw Beavers for a consult.  (*Id.* at 645.)  On examination, Dr. Roberts found Beavers to be in no apparent distress.  (*Id.* at 646.)  He walked without a limp and was able to stand on his heels and toes.  (*Id.*)  Dr. Roberts noted mild lumbar tenderness to palpation at the lumbosacral junction and mild right sciatic notch tenderness.  (*Id.*)  A straight leg test was negative, Beavers had no pain during a hip roll test, and motor strength of the

9

hip flexors, quadriceps, hamstrings, ankle dorsi, plantar flexors, and extensor hallucis longus were intact.  (*Id.*)  Dr. Roberts found diminished sensation in the right calf compared to the left, as well as diminished sensation in the right lateral thigh.  (*Id.*)  Dr. Roberts reviewed the relevant imaging and determined there was very little difference between the current MRI and the 2015 MRI.  (*Id.*)  Dr. Roberts found Beavers's symptoms did not match precisely with the abnormalities found.  (*Id.* at 647.)  He recommended pain management, including epidural steroid injections.  (*Id.*)

On September 30, 2016, Beavers returned to Dr. Shaia, who noted that Dr. Roberts had recommended a diagnostic and therapeutic injection of the L5 nerve root.  (*Id.* at 630.)  On examination, Dr. Shaia found Beavers to be in moderate to severe discomfort with an antalgic gait, but he was otherwise normal.  (*Id.* at 631.)  Beavers indicated he was interested in the epidural injections.  (*Id.*)

On October 25, 2016, Beavers again saw Dr. Shaia.  (*Id.* at 633.)  Beavers's insurance company had rejected the epidural steroid injection.  (*Id.*)  Examination again showed moderate to severe discomfort with a severely antalgic gait, but otherwise normal findings.  (*Id.* at 634.)  Dr. Shaia prescribed a dose of steroids and physical therapy and hoped for approval of the epidural steroid injections by the insurance company.  (*Id.*)

On November 29, 2016, Beavers returned to Dr. Shaia and was still in terrible pain.  (*Id.* at 636.)  Beavers reported that physical therapy made his pain significantly worse.  (*Id.*)  Dr. Shaia noted Beavers was using a rolling walker to ambulate.  (*Id.* at 637.)  A physical examination found Beavers to be in severe discomfort with a severely antalgic gait and a positive straight leg-raise test on the right, but no motor deficits.  (*Id.*)  Dr. Shaia noted the insurance company had consistently refused to approve the injections.  (*Id.*)  As Beavers could not tolerate physical therapy and did not

10

want surgery, Dr. Shaia renewed Beavers's narcotic prescription for pain relief.  (*Id.*)

On December 21, 2016, Beavers underwent a transforaminal lumbar epidural steroid injection at the right L5 level.  (*Id.* at 639.)

On January 10, 2017, Beavers returned to Dr. Templeton and reported he had fallen again a month ago and had severe pain in the left knee and mild pain in the left hip.  (*Id.* at 664.)   Dr. Templeton noted Beavers was bearing weight on his left leg, albeit with discomfort around his left knee.  (*Id.*)  On examination, Dr. Templeton found Beavers was in moderate distress, with left-knee swelling and tenderness to palpation.  (*Id.* at 665.)  Other examination findings included: (1) painless right hip and knee range of motion; (2) non-tenderness over the trochanteric bursa and sacroiliac joint; (3) visible swelling of the left knee; (4) the ability to initiate and maintain a straight leg raise without extensor lag; (5) tenderness to palpation along the medial and lateral joint line; (6) left EHL, plantarflexion, and dorsiflexion 5/5; (7) left knee flexion and extension 4+/5; (8) left hip flexion and abduction 5/5; and (9) intact sensation to light touch in all dermatomes.  (*Id.* at 665-66.)  A radiograph of the left knee showed tricompartmental degenerative changes, superior spurring, and calcification along the distal quadricep tendon.  (*Id.* at 666.) Dr. Templeton noted Beavers was doing well after his left hip replacement but had subacute left hip pain, likely related to traumatic trochanteric bursitis, and symptomatic primary osteoarthritis of the left knee.  (*Id.*)  Dr. Templeton administered a corticosteroid injection to Beavers's left knee.  (*Id.*)

On February 22, 2017, Beavers saw Dr. Templeton for left knee pain.  (*Id.* at 668.)  Beavers received only one to two days of relief from the injection, and was experiencing increasing discomfort, including catching, locking, and giving way. (*Id.*) Beavers had been using a commercial knee sleeve and hydrocodone intermittently for the pain.   (*Id.*)  On examination, Dr. Templeton

found synovitis of the left knee, tenderness along the joint line, positive McMurray test, and subtle laxity versus the right knee.  (*Id.* at 669.)  Dr. Templeton noted normal left EHL, plantarflexion, and dorsiflexion.  (*Id.*)  Left knee flexion and extension were 4+/5.  (*Id.*)  Dr. Templeton recommended an MRI for the left knee and a short course of Percocet, but recommended against another corticosteroid injection at this time.  (*Id.* at 669-70.)

On March 3, 2017, Beavers again saw Dr. Templeton for ongoing left knee pain.  (*Id.* at 671.)  On examination, Dr. Templeton found Beavers to be in minimal distress with synovitis of the left knee.  (*Id.* at 672.)  Beavers's range of motion in the left knee was intact from -2 degrees of extension to 110 degrees of flexion, limited by discomfort.  (*Id.*)  Left EHL, plantarflexion, dorsiflexion, knee flexion, and knee extension were 4+/5, limited by discomfort.  (*Id.*)  Dr. Templeton's exam showed otherwise normal findings.  (*Id.*)  A review of the recent MRI showed a small ruptured cyst, which did not coincide clinically with Beavers's pain, evidence of edema, a minimally displaced radial tear, and mild to moderate arthritic change.  (*Id.*)  Dr. Templeton recommended continued icing, modified activities, and a knee brace as needed, and he administered an injection of DepoMedrol, Lidocaine, and Marcaine. (*Id.* at 673.)  Dr. Templeton also noted that the physical therapy Beavers was undergoing for his hip also included stretching and strengthening for the knee.  (*Id.*)

On April 24, 2017, Beavers saw Sohil Patel, M.D., for left knee and leg pain.  (*Id.* at 676.)  On examination, Dr. Patel found decreased range of motion, abnormal meniscus, and tenderness of the left knee.  (*Id.* at 678.)  Dr. Patel also found lumbar pain and spasm. (*Id.*)  Dr. Patel prescribed albuterol, aspirin, Neurontin, and Percocet.  (*Id.* at 679.)

12

C.      **State Agency Reports**[8]

On October 19, 2015, state agency reviewing physician Bradley Lewis, M.D., opined there was insufficient evidence date last insured ("DLI") of December 31, 2014[9] to evaluate Beavers's condition.  (Tr. 110-12.)

On December 23, 2015, James Cacchillo, D.O., affirmed the initial determination that there was insufficient evidence to evaluate Beavers's impairments, as there was no additional evidence obtained that pre-dated Beavers's DLI.  (*Id.* at 118-20.)

D.      **Hearing Testimony**

During the May 2, 2017 hearing, Beavers testified to the following:

- He tried to work as a crane operator in 2016 but was fired after a little less than two months for taking too many breaks and being away from the controls for too long because he "can't sit too long" or "stand too long."  (Tr. 81-82, 92.)

- He is able to drive, but sometimes he has to pull over and get out because he gets "excruciating pain" in his back.  (*Id.* at 84.)

- He lives with his girlfriend and his mother.  (*Id.*)

- His mother shops for his groceries, although he goes with her occasionally.  (*Id.* at 84-85.)

- He tries to load this dishwasher for his mother and girlfriend, and he tries to plant in the garden for his friend.  (*Id.* at 84.)

---

[8] Beavers does not challenge the state agency reviewing sources' determination that there was insufficient evidence to evaluate his mental impairment claims, and his brief raises arguments solely related to his physical impairments.  Therefore, in the interest of judicial economy, the Court discusses only the evidence related to Beavers's physical impairments.

[9] The ALJ and the Appeals Council found Beavers's DLI to be June 30, 2015.  (Tr. 14, 53, 55.)  Beavers represents that this date "does not otherwise appear in the record." (Doc. No. 11 at 1 n.1.)

13

- He has a hard time getting dressed when he has bad days.  (*Id.* at 86.)

- He had rheumatoid arthritis as a child and had to receive injections, take medication, and wear braces to treat it until he was seven years old.  (*Id.* at 86-87.)

- The arthritis returned to his hips by 2015.  (*Id.* at 87-88.)

- He had been having problems with his hips for about a year and a half before that. (*Id.* at 89.)  He sought treatment when the pain became unbearable.  (*Id.*)

- His doctor told him he needs a left knee replacement.  (*Id.* at 88.)

- He uses a cane all the time.  (*Id.* at 90.)  But he was not using a cane at the hearing. (*Id.*)

- He thought his hip surgery had been successful, but he could still only stand for five to ten minutes.  (*Id.*)  After that, his legs start to go numb.  (*Id.*)

- Recent treatment for his back pain consisted of shots, injections, and TENS unit therapy.  (*Id.* at 93.)

The VE testified Beavers had past work as a carpenter and an auto mechanic.  (*Id.* at 96-97.)

The ALJ then posed the following hypothetical question:

>  If you would consider a person of the claimant's age, education, and past relevant work activity; with a capacity for light work; with the ability to use the left lower extremity occasionally, to operate foot controls; and the ability to use bilateral hands frequently, for fingering and feeling.  Would that individual be able to perform the type of work the claimant performed in the past?

(*Id.* at 97.)

The VE testified the hypothetical individual would not be able to perform Beavers's past work as a carpenter and auto mechanic.  (*Id.*)  The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as a sales attendant, food service worker, and mail clerk.  (*Id.* at 98.)

14

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of

15

impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Beavers was insured on his alleged disability onset date, February 1, 2012, and remained insured through December 31, 2014, his DLI.  (Tr. 225.)  Therefore, in order to be entitled to POD and DIB, Beavers must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through June 30, 2015.[10]

2.     The claimant has not engaged in substantial gainful activity since February 1, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.     The claimant has the following severe impairments: dysfunction of major joints and degenerative disc disease (20 CFR 404.1520(c) and 416.920(c)).

---

[10] This date appears to be error.  *See* n.9, *supra*.

16

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.       After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant has the ability to use the left lower extremity occasionally to operate foot controls, and the ability to use the bilateral hands frequently for fingering and feeling.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on May **, 1962 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.   The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8.      The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 55-72.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414 (6th

Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the

Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Beavers asserts the ALJ's finding that he could stand and/or walk for six hours in an eight-hour workday lacks the support of substantial evidence as "[t]he record simply contains no objective evidence contrary to Plaintiff's subjective allegations, and no medical opinions contrary to his subjective allegations."  (Doc. No. 11 at 12.)  The record contains no consultative examinations, no RFC determinations by the state agency reviewing physicians, and no medical opinions regarding Beavers's functional abilities.  (*Id.* at 11.)  The ALJ, then, "was the first and only source to review the medical record and devise a [RFC]," and Beavers maintains that the objective medical evidence

19

fails to support the ALJ's finding that he could perform light work.  (*Id.*)

The Commissioner asserts that substantial evidence supports the ALJ's RFC.  First, Beavers omitted the conflicting evidence in the record that the ALJ considered in her decision.  (Doc. No. 14 at 5.)  Second, the ALJ addressed all the evidence Beavers relies on to support his argument and "showed it was not as compelling" as Beavers presents it.  (*Id.*)  Third, the ALJ was not required to adopt Beavers's subjective allegations wholesale, and the Commissioner asserts that Beavers's statement that there is no objective evidence contrary to his subjective complaints in the record is false, as demonstrated by the conflicting evidence in the record discussed by the ALJ.  (*Id.* at 5-6.) Beavers bears the burden of proof at Steps One through Four of the sequential analysis, and the Commissioner maintains that to the extent Beavers suggests the ALJ had a duty to obtain medical opinions for the record, that is a "misplaced attempt to shift the burden" to the Commissioner.  (*Id.* at 6.) Finally, to the extent Beavers argues the RFC lacks substantial evidence because it was not based on a medical opinion, that argument fails under Sixth Circuit law.  (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[11]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence (20 C.F.R. § 416.946(C)), and must consider all of a claimant's medically determinable impairments, both individually and in

---

[11]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

20

combination.  SSR 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, 1996 WL 374184, at *7 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

### 1.    DIB Claim

The relevant period for Beavers's DIB claim is February 1, 2012 through December 31, 2014.[12]  The ALJ found that while Beavers alleged a February 1, 2012 onset date, "the record contains little by way of medical evidence until years later."  (Tr. 60.)  The ALJ's determination echoed those of the state agency reviewing sources on initial review and reconsideration that there was insufficient evidence in the record before Beavers's DLI to make a determination regarding

---

[12] *See* n.9-10, *supra*.

Beavers's impairments.[13] (*Id.* at 110-12, 118-20.)  Beavers's brief does not discuss any medical evidence before 2015.  (Doc. No. 11. at 3-9.)

A review of the records during the relevant period show some falls with head trauma and complaints of leg pain.  (Tr. 278-326).  While the records reflect pain to palpation and an unsteady gait at times (*id.* at 281, 289, 290, 293), the records also note full range of motion of the left hip, the ability to bear weight on the left leg, a normal gait, the ability to mobilize well, and full strength in the upper and lower extremities bilaterally.  (*Id.* at 281, 285, 289, 290, 295, 297, 301.)  The records also note that before Beavers was admitted to the hospital in 2012, he was independent with his ADLs and his mobility.  (*Id.* at 298.)

Based on all of the above, the Court cannot say that the ALJ's RFC finding through December 31, 2014 lacked substantial evidence.

   2.   **SSI Claim**

      a.  **Scope of Review**

Neither party raises this issue in their briefs, but because the Appeals Council granted Beavers's request for review of his SSI claim and then issued a decision, that decision is the final decision of the Commissioner in this case.  *See* 20 C.F.R. § 416.1481 ("The Appeals Council decision. . . is binding unless you or another party file an action in Federal district court, or the decision is revised.").  Review of the Appeals Council decision, however, reveals that the Appeals Council "affirmed" many of the ALJ's conclusions, including those relevant to the analysis of medical evidence:

---

[13] Beavers failed to respond to SSA's attempts to obtain additional information.  (Tr. 110-12, 118-20.)

22

The Appeals Council adopts the [ALJ's] statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the *evidentiary facts, as applicable.*

\*\*\*

The Appeals Council adopts the [ALJ's] findings at steps one, two, and three of the sequential evaluation process.

\*\*\*

*For reasons set forth by the [ALJ],* the Council also finds that the claimant has the [RFC] to perform a range of light work as defined in 20 CFR 416.967(b), and that the claimant is unable to perform any past relevant work at step four (Findings 5 and 6).  Specifically, as to the claimant's [RFC], we find that the claimant has the [RFC] to lift and carry 20 pounds occasionally and 10 pounds frequently; to stand and walk six hours in an eight-hour workday; to use the left lower extremity occasionally to operate foot controls, and to use the bilateral hands frequently for fingering and feeling (Finding 5).

\*\*\*

However, prior to May \*\*, 2017, an individual who has the vocational factors described above and who has the [RFC] to perform a reduced range of the light exertional level is found to be not disabled within the framework of Rule 202.11, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2.[14]

(Tr. 6) (emphasis added).  Where the Appeals Council relies on or adopts the findings of an ALJ, "the substantial evidence standard of review applies to the findings regardless of whether they were made by the Appeals Council, the ALJ, or were made by the Appeals Council in reliance on the ALJ's findings." *Taylor v. Comm'r of Soc. Sec.*, 91 F.3d 144 (Table), 1996 WL 400175, at \*4, n.2 (6th Cir. 1996).  Accordingly, this Court reviews the conclusions of the ALJ to the extent that the

---

[14] For the period beginning on May \*\*, 2017, the Appeals Council declined to adopt the ALJ's determination as Beavers changed age categories and would be found disabled by Rule 202.02, Table No. 2 of 20 CFR Part 404, Subpart P, Appendix 2.

23

Appeals Council affirmed them.  *Cunningham v. Colvin*, 2014 U.S. Dist. LEXIS 174469, at *23 (N.D. Ohio Dec. 17, 2014).

### b.  Analysis

The ALJ devoted a total of eight pages to discussing the medical records from 2015 through 2017 at Step Four.  (Tr. 60-68.)  Of particular relevance, the ALJ discussed Beavers's allegations of pain, and his testimony that he could not stand for long periods of time without pain.  (*Id.* at 59-60, 68.)  The ALJ analyzed the imaging Beavers had done over the years, his hip surgery in 2016, and his treatment for his back and leg pain.  (*Id.* at 60-68.)  The ALJ also noted Beavers's attempt to return to work in 2016.  (*Id.* at 69.)  On review, the Appeals Council made the following findings with respect to the medical evidence:

- The evidence does not support a sedentary RFC.  (*Id.* at 5.)

- January 2017 progress notes "indicate the claimant was doing well nine months post left hip replacement."  (*Id.*)  "Left knee flexion and extension were 4+/5 and the claimant was able to initiate and maintain straight leg raising without extensor lag (Exhibit 17F)."  (Tr. at 5-6.)

- In April 2017, "the claimant had decreased range of motion in the left knee but no swelling or effusion (Exhibit 18F)."  (Tr. at 6.)

The ALJ formulated the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant has the ability to use the left lower extremity occasionally to operate foot controls, and the ability to use the bilateral hands frequently for fingering and feeling.

(Tr. at 58-59.)  The Appeals Council affirmed this RFC for the reasons set forth by the ALJ up to the date of Beavers's 55th birthday.[15]  (*Id.* at 6.)

---

[15] *See* n.14, *supra*.

24

In support of the RFC, after her extensive review of the medical records, the ALJ explained:

> As shown above, the claimant experiences pain as a result of moderate cervical degenerative disc disease, severe lumbar degenerative disc disease, severe left hip osteoarthritis, mild degenerative arthritis of the bilateral hands, and mild to moderate  tricompartmental osteoarthritis of the left knee (Exhibit IF, 2F, 3F, 4F, SF, 6F, 7F, 8F, 9F, l0F, l lF, 13F, 15F, 16F, 17F, 18F). These conditions would reasonably result in difficulty with particular activities, including lifting and carrying, and prolonged standing, walking, and sitting. In order to accommodate the claimant's limitations due to pain, the undersigned limits the claimant to light work, where he is expected to lift and carry up to twenty pounds occasionally, meaning  very little to one third  of the day, and ten pounds frequently, meaning one third to two thirds  of  the  day.  Despite  the claimant's cervical and lumbar   degenerative   disc disease with radiculopathy, and mild arthritis of the bilateral hands, he maintains full upper extremity strength, normal upper extremity sensation and reflexes, and intact coordination (Exhibit 5F, 7F, 8F, 9F, 1lF, 12F, 13F, 14F, 15F, 16F, 18F).
>
> Thus, the claimant is able to perform the lifting and carrying requirements of light work. As for the claimant's allegations that he cannot sit, stand, or walk for long periods, the record fails to demonstrate that the claimant is unable to perform the reduced exertional requirements of light work.  To the claimant's credit, examinations have revealed  chronic low back pain with decreased lumbar range of motion, occasionally decreased right lower extremity sensation, and positive straight leg raising, in addition to left hip pain with decreased range of motion and weakness, left knee tenderness with slight weakness and laxity, and at times, a severely antalgic gait (Exhibit 4F, SF, 6F, 7F, 8F, 9F, l0F, l1F, 12F, 13F, 15F, 16F, l 7F, 18F). However, the claimant maintains full right lower extremity strength, otherwise full left lower extremity strength, otherwise normal sensation, generally normal reflexes, and consistently independent ambulation *(Id.)*. Thus, the claimant is able to stand, walk, and sit up to six hours  in an eight- hour workday as required by light  work.
>
> Nevertheless,  given  the  claimant's  history  of  advanced  left  hip osteoarthritis,  with  persistent  left  hip  tenderness  despite  total  hip replacement,  in  conjunction  with  the  evidence  of  tricompartmental degenerative changes of the left knee, with knee tenderness, weakness, decreased range of motion, and occasional, subtle left knee laxity, the

undersigned limits the claimant to occasional operation of foot controls with the left lower extremity (Exhibit 6F, l0F, l1F, l 7F, 18F). However, greater restrictions are not warranted, given the recent evidence of improved left hip functioning, with good postoperative appearance on x-ray, and only slightly decreased left knee strength and subtle laxity (Exhibit l 7F). In light of the claimant's mild degenerative arthritis of the bilateral hands, moderate cervical degenerative disc disease with radiculopathy, and advanced degenerative disc disease of the lumbar spine, he is limited to frequent fingering and feeling with the bilateral hands (Exhibit IF, 2F, 3F, 4F, 5F, 6F, 7F, 8F, 9F, l0F, llF, 13F, 15F, 16F, l 7F, 18F). However, greater manipulative restrictions are not appropriate, as the claimant maintains full upper extremity strength, normal upper extremity sensation and reflexes, and intact coordination (Exhibit 5F, 7F, 8F, 9F, llF, 12F, 13F, 14F, 15F, 16F, 18F).

In addition to the objective medical evidence, the undersigned has also considered other factors in evaluating the claimant's statements concerning the intensity, persistence, duration and limiting effects of his severe medically determinable impairments, including the claimant's daily activities and the claimant's history of treatment. However, these factors do not show that the claimant is more limited than determined when setting forth the above residual functional capacity.

The claimant's activities of daily living detract from his allegations of totally debilitating impairment and instead support the foregoing residual functional capacity. The claimant testified that he has to pull over and get out of the car while driving and has difficulty writing  and performing his self-care activities (Hearing Testimony). However, the claimant is able to load the dishwasher and garden, activities that require bending, and he is able to read and go grocery shopping with his mother *(Id.)*. In addition, the claimant was able to perform some significant recent work activity operating heavy machinery equipment (Exhibit  9D, 11D, Hearing Testimony). This evidence confirms the claimant is not as physically limited as he has alleged.

In assessing the claimant's allegations, the undersigned has considered the scope of treatment. Although the claimant alleges an onset date of February 1, 2012, the record contains little evidence of medical treatment until 2015 (Exhibit IF, 2F, 3F, 4F). Since June 2015, the claimant has undergone orthopaedic treatment with Dr. Templeton, in addition to more recent treatment with orthopaedic specialist Dr. Shaia, and the record also contains evidence of emergency department visits,

injection therapy, total left hip replacement, use of a TENS unit, evaluations with a pain management specialist and rheumatologist, and recent primary care (Exhibit IF, 2F, 3F, 4F, SF, 6F, 7F, 8F, 9F, l0F, llF, 13F, 15F, 16F, 17F, 18F, Hearing Testimony). Despite ongoing orthopaedic treatment, which has included use of strong narcotic pain medication, the claimant has remained symptomatic, thereby confirming a need for continued medication and treatment (Exhibit IF, 2F, 3F, 4F, 5F, 6F, 7F, 8F, 9F, l0F, llF, 13F, 15F, 16F, 17F, 18F).

However, the medical record indicates significant improvement with left hip replacement, and the claimant does not require use of an assistive device with ambulation (Exhibit l0F, 17F, 18F, Hearing Testimony). Recent treatment notes indicate an inability to tolerate physical therapy (Exhibit 15F, 16F); however, despite the claimant's reportedly debilitating pain, he has not sought alternative treatment modalities such as acupuncture, massage therapy, chiropractic treatment, or participation in pain management or a chronic pain rehabilitation program. This suggests the claimant's physical conditions, while severe, are manageable with the current scope of relatively conservative medical treatment.

The claimant has alleged numerous complaints in support of his application for disability, and the record does support some limitations due to his symptoms and allegations. However, when considering the claimant's testimony in light of the limited, conservative treatment record and the mainly moderate examination findings, the claimant's impairments are not as debilitating as he has alleged. The allegations of disability made by the claimant are therefore not entirely consistent with the evidence.

(Tr. 68-69.)

The Court recommends finding substantial evidence supports the RFC. The ALJ provided an extensive analysis of the medical records and the conflicting evidence, weighed the evidence, and determined Beavers could perform light work. (*Id.* at 60-70.) On review, the Appeals Council affirmed that determination up to the date of Beavers's 55th birthday. (*Id.* at 6.) On judicial review, Beavers points to no contrary lines of evidence that the ALJ ignored or overlooked. (Doc. No. 11 at 11-12.) In his brief, Beavers relies heavily on evidence that either pre-dated or very closely post-dated his hip replacement in April 2016 (*id.*), despite the fact that he testified his hip surgery had

been successful, the record demonstrated improvement after his surgery, and he appeared at the 2017 hearing without a cane or other assistive device.   (Tr. 69, 90.)

At bottom, Beavers asks the Court to re-weigh the evidence, which it cannot do.  While Beavers or the Court may weigh the evidence differently, the Court does not review the evidence *de novo* and the Agency's determination is not subject to reversal because there is substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.  The substantial evidence standard is whether there is "such relevant evidence a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241 (internal quotation marks omitted).  That standard was met here, and the Agency was within the zone of choice for the determination that Beavers was not disabled before his 55th birthday.

To the extent Beavers argues the RFC is in error because it is not supported by any medical opinion, the Sixth Circuit specifically has rejected such an argument: "[T]he Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013).  *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. 2017).

28

For all of the reasons discussed above, the Court recommends the ALJ's decision regarding Beavers's DIB claim, as well as the Appeals Council's decision regarding Beavers's SSI claim, be affirmed.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: October 1, 2019

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**